2026 IL App (1st) 241561-U

SECOND DIVISION
June 30, 2026

No. 1-24-1561

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|  | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
|  | ) |  |
| v. | ) | 08 CR 03655 |
|  | ) |  |
| ANTONIO BLANCHARD, | ) | Honorable |
|  | ) | Michael J. Hood, |
| Petitioner-Appellant. | ) | Judge Presiding |
|  | ) |  |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Petitioner's evidence in support of his actual innocence claim is not of such conclusive character that it would likely change result of his original trial. Petitioner did not rebut presumption that postconviction counsel performed reasonably.

¶ 2    Antiono Blanchard, convicted of armed robbery and serving a 40-year sentence, returns to the appellate court for a fourth time, this time appealing the dismissal of his successive postconviction petition. Finding no merit to his arguments that he has a viable actual-innocence claim or that postconviction counsel performed unreasonably, we affirm.

¶ 3                                    BACKGROUND

¶ 4    We take the facts from Blanchard's bench trial and his previous appeals. The State

accused Blanchard of robbing Michael Malachowski at gunpoint on February 7, 2008. At trial, Malachowski testified that on that morning, at about 6:30 a.m., he was walking in the 1400 block of North Wood Street headed to work. He was approached by a man who was approximately six feet tall and wearing dark pants and a dark grey or black jacket with fur around the hood. The man pulled out a gun and demanded Malachowski's wallet. Malachowski handed it over, the man fled, and Malachowski went to his car and called the police to report the robbery and give dispatchers a description of the robber.

¶ 5    Shortly thereafter, a flash message went out to police officers in the area with the description of the assailant. One officer, Jorge Hernandez, was about three blocks from the area of the robbery and saw someone matching the description near Paulina and Julian Streets. Driving with a partner in a squad car, Hernandez parked the car, and both he and his partner got out of the vehicle. The man saw them, then turned and ran away. Hernandez chased the man (whom he later identified as Blanchard) for a couple of minutes before turning around and going back to retrieve the car while his partner continued to chase the man.

¶ 6    They lost him but searched the area until they saw him a second time; the suspect again fled. By now, another officer, Rodriguez, had joined in the chase and caught the man. Hernandez eventually went back to where he had seen the fleeing suspect and searched the area. On a windowsill of a building, Hernandez found Malachowski's wallet. Malachowski would later confirm that the items Hernandez recovered were his wallet and its contents.

¶ 7    Rodriguez's partner, Hector Agosto, testified that while he and Rodriguez were searching the area, they saw a man matching the robber's description walking down the street. The man, whom Agosto identified as Blanchard, took flight but slipped on some ice, allowing Agosto and Rodriguez to arrest him. Agosto then searched the man's pockets and found a credit card that

belonged to Malachowski. Later that same day, Malachowski went to the police station and viewed a lineup. He identified Blanchard as the man who robbed him.

¶ 8    Blanchard testified in his defense at his trial. He claimed he was walking on the street on the way to a friend's house when a police squad car approached him. Two men got out, shouting profanities at him and, in his words, told him that they were going to "blow [his] brains out." Blanchard dashed off, trying to get away, but slipped on some ice and fell. That allowed the officers to catch him, handcuff him, and search his pockets. He claimed that he did not rob Malachowski but admitted that he was wearing a dark jacket with fur on the hood. Blanchard also said that he did not see when the officer purportedly took the credit card out of his pocket.

¶ 9    The court found Blanchard guilty of armed robbery with a firearm and sentenced him to 40 years in prison. We affirmed his conviction and sentence on appeal. *People v. Blanchard*, No. 1-09-0753 (unpublished order under Supreme Court Rule 23).

¶ 10    In December 2011, Blanchard filed a postconviction petition, claiming his trial counsel was ineffective in various ways, that a detective had perjured himself at trial, and that the State used false evidence to convict him. Counsel was appointed and filed a supplemental petition. Blanchard filed his own *pro se* amendment to the petition he had previously filed. On the State's motion, the trial court dismissed the petition.

¶ 11    We reversed, unsure if postconviction counsel had examined the exhibits (which appellate counsel found but trial counsel apparently had not). We remanded for further proceedings, asking postconviction counsel to look at the recovered credit card. *People v Blanchard*, 2015 IL App (1st) 132281, ¶ 14.

¶ 12    Back in the trial court, the parties agreed to have the now-found credit card tested for DNA evidence. See 725 ILCS 5/116-3 (West 2016) (permitting DNA testing in proceedings after

conviction). That testing was done by the Illinois State Police (ISP) laboratory; the results were inconclusive, as a mixture of at least three people's DNA had been found on the card. The lab concluded that the "mixture is not suitable for comparisons or entry into the DNA index." As part of the processing, the lab destroyed the DNA sample collected from the credit card.

¶ 13    Having grown frustrated with his appointed postconviction counsel, Blanchard filed a motion to represent himself and repeatedly complained about her work on his case. He also told the court that he had found an independent forensic expert, Karl Reich with Independent Forensics, who was willing to work on his case.

¶ 14    After multiple court hearings, the court finally granted Blanchard's request to represent himself. Blanchard later filed an amended postconviction petition; he added a couple of claims to his previous petition and included a report from Reich.

¶ 15    In that report, Reich criticized the ISP's analysis and conclusions. He took the data the ISP lab gave him and concluded that Blanchard was "more likely than not to be excluded as a contributor to" the DNA found on the credit card. Blanchard did not, however, use Reich's report as the basis for an actual-innocence claim.

¶ 16    The court ultimately dismissed the petition. On appeal, Blanchard argued that he did not knowingly and voluntarily waive his right to postconviction counsel and that postconviction counsel had performed unreasonably before they had been dismissed. We affirmed, noting in passing that Blanchard had not used Reich's report to make an actual-innocence claim. *People v. Blanchard*, 2023 IL App (1st) 191311-U.

¶ 17    What followed in the circuit court was a morass of petitions filed by Blanchard over the years, all of which were incorporated later into a single post-conviction petition, but which are necessary to detail to address one of the arguments on appeal. The specific nature of each filing

is less important than their sheer numerosity.

¶ 18    On July 15, 2020, Blanchard filed a motion styled "Relief of Judgment Petition Purusant [sic] to 735 ILCS 5/13-214.3(c)." The motion sought relief under section 2-1401 of the Code of Civil Procedure, 735 ILCS 5/2-1401 (West 2020). Among many other things, Blanchard alleged that his previous postconviction attorney performed unreasonably, that key evidence was destroyed, and that his sixth and fourteenth amendment rights were violated. He mentioned Reich's DNA report several times in the *pro se* filing but again did not allege actual innocence.

¶ 19    On July 27, 2021, Blanchard filed a motion titled "Motion for Compliance with Ethics Rule 3.8." He reiterated his various errors in his trial and initial postconviction proceedings but also made a claim of actual innocence based on Reich's DNA report. A new copy of Reich's report was filed with the motion. More *pro se* filings followed, several discussing the DNA report and claiming it proved his innocence.

¶ 20    The trial court eventually appointed counsel who requested that the "2-1401 petition" be reclassified as a post-conviction petition. Though counsel only named the section 2-1401 petition, the parties seemed to understand that the request encompassed several—if not all—of the various filings Blanchard had made since his last postconviction petition was dismissed. Blanchard told the court he was fine with that, and the court reclassified the filings as a single post-conviction petition at the second stage of proceedings.

¶ 21    In June 2022, counsel filed a certificate of compliance with Illinois Supreme Court Rule 651(c), swearing that counsel had met with Blanchard and had reviewed the court file, the previous appeals, the 2017 Illinois State Police DNA report, and Reich's report from 2018.

¶ 22    Counsel also attached copies of those two reports to the certificate. Counsel certified that "I have not filed a Supplemental Petition for Post-Conviction Relief. The above-stated

paragraphs (in the certificate) as well as the *pro se* successive petition for post-conviction relief adequately set forth the petitioner's claims of deprivation of his constitutional rights."

¶ 23    Blanchard wasn't done. In September 2022, he filed a *pro se* "Motion to Place Before the Court An Affidavit That Authenticates the 5/23/2018 DNA Test Results And Also Transcripts from the 5/24/2019 Court Proceedings." This filing seemed to be an addendum to the documents that postconviction counsel filed with her Rule 651(c) certificate. In it, Blanchard fleshed out his claim of actual innocence, arguing that the DNA evidence from Reich proved that Blanchard can be excluded from the three profiles recovered on the credit card and that "I have not committed any crimes[.]" Blanchard also attached a new affidavit from Reich, in which he averred that "there is no forensic DNA link to Mr. Blanchard from the analysis of the credit card. Thus, there is no forensic DNA support for the allegation that he handled, received or in any way had contact with the credit card."

¶ 24    About a year later, the State filed two motions—one to dismiss Blanchard's postconviction petition, the other to dismiss his section 2-1401 petition. The motions did not clarify which specific filings they were seeking to dismiss. In the motion to dismiss the postconviction action, the State argued that his actual-innocence claim was barred by *res judicata*. In the motion to dismiss the section 2-1401 petition, the State claimed that none of Blanchard's claims were the kind that could be addressed via a section 2-1401 petition.

¶ 25    On February 8, 2024, Blanchard responded to his counsel's certificate with another *pro se* filing purporting to respond to counsel's Rule 651(c) certificate. In that filing, Blanchard recapped the filings in the case and noted that on February 4, 2022, his "request to reclassify the petition as a petition for postconviction relief was granted." Blanchard expounded on some claims he had already made and added others for the first time, none of which are relevant here.

¶ 26    The next day, the parties (including Blanchard) appeared in court, where postconviction counsel acknowledged Blanchard's newest filing and asked the court to withdraw any pending 2-1401 petition and only proceed with the postconviction petition. Counsel then clarified what Blanchard was going forward on: The claims in the original filing that had been reclassified as a postconviction petition (from 2020 and 2021), what counsel included in her Rule 651(c) filing, and Blanchard's *pro se* response. The court then asked Blanchard if "the filing you have just sent, the February (2024) filing, that relates to the postconviction?" Blanchard answered yes.

¶ 27    A few court dates later, the court held a hearing on the State's motion to dismiss. Just before the hearing, postconviction counsel filed a supplemental petition and added two new claims: (1) that police officers violated their duty to Blanchard to turn over exculpatory evidence per *Brady v. Maryland*, 373 U.S. 83 (1963), when they only provided him with three out of six photos of the lineup he was in after he made a Freedom of Information Act request for them; and (2) that he "believes that he heard the police speaking with a person in a nearby car while he was handcuffed" and thus was subjected to a "highly suggestive" drive-by or show-up identification before Malachowski viewed the lineup later at the police station. Counsel did not attach any additional support for these claims to the supplemental petition.

¶ 28    At the hearing, counsel briefly argued in support of Blanchard's position but also admitted that "[w]e did investigate [the claims in the petition]. We weren't able to find anything to support [the claims.]" That said, counsel argued that Reich's affidavit and report and the DNA evidence made a substantial showing that Blanchard was actually innocent of the crime and that he was entitled to an evidentiary hearing on that claim. The court dismissed the petition.

¶ 29                                    ANALYSIS

¶ 30    On appeal, Blanchard claims that he made a substantial showing of actual innocence and,

if he did not, that postconviction counsel performed unreasonably.

¶ 31                                        I. Actual Innocence

¶ 32      The Post-Conviction Hearing Act allows criminal defendants to challenge their
conviction based on a substantial denial of their constitutional rights. 725 ILCS 5/122-1(a)(1)
(West 2022). Only one postconviction proceeding is contemplated under the Act, but the bar
against successive proceedings will be relaxed, among other instances, for claims of actual
innocence. See *People v. Robinson*, 2020 IL 123849, ¶ 42.

¶ 33      At the second stage of proceedings, where Blanchard finds himself, he must make a
"substantial showing of actual innocence to warrant an evidentiary hearing." *Id.* The court asks
whether those allegations, if believed, would entitle the petitioner to relief at an evidentiary
hearing. *People v. Domagala*, 2013 IL 113688, ¶ 35. We review the dismissal of a second-stage
petition *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 34      Evidence supporting a claim of actual innocence must be (1) newly discovered; (2)
material and not cumulative; and (3) of such conclusive character that it would probably change
the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. The "most important element" is
the "conclusive" prong. *Id*. We ask there whether the new evidence "places the trial evidence in a
different light and undermines the court's confidence in the judgment of guilt." *Id*. ¶ 48.

¶ 35      Blanchard claims he made a substantial showing of actual innocence based on Reich's
DNA report, so we should drill down on what precisely Reich concluded. His report indicated
that the DNA sample "is a mixture of an unknown number of contributors." Reich found it
"likely that there is a major contributor (one person in the mixture who left more DNA than the
other contributors)." Reich concluded that Blanchard "can be excluded as the major contributor"
and is "*more likely than not* to be excluded as a contributor" at all. (Emphasis added.)

¶ 36    We assume Reich's expert opinion to be true at the second stage. *Domagala*, 2013 IL 113688, ¶ 35. But unfortunately for Blanchard, it is not of such a conclusive character that it would probably change the result of this case on retrial. While this evidence is certainly helpful to him, it does not prove as much as he would like. First and foremost, the DNA results do not undermine most of the evidence that convicted Blanchard.

¶ 37    When apprehended, Blanchard's physical appearance and clothing matched the description given by the robbery victim, including the rather distinct detail that the robber's hood was bordered with fur. And the victim soon thereafter identified Blanchard in a line-up. See *People v. Gray*, 2017 IL 120958, ¶ 36 (testimony of single witness is sufficient to convict if testimony is "positive and credible"). Blanchard also ran from multiple police officers. See *People v. McNeil*, 2019 IL App (1st) 180015, ¶ 83 (flight is generally considered at least some evidence of guilty mind). And the victim's wallet was recovered along the path he fled. The non-match of his DNA on the credit card does not lay a glove on any of that evidence. See *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008) ("DNA evidence that plays a minor role and is a collateral issue *** does not significantly advance a claim of actual innocence.").

¶ 38    The only inculpatory evidence that the non-match impacts is the officers' testimony that the credit card was found in Blanchard's pants pocket. But the non-match does not even conclusively disprove *that* evidence. Reich thought it likely, not certain, that Blanchard's DNA was not in that sample. And in any event, not every human contact with a surface produces a lasting DNA remnant; the (likely) absence of his DNA on the credit card does not necessarily mean that Blanchard did not handle that credit card and place it in his pocket. See *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) ("[t]he absence of defendant's DNA on the gun would not conclusively establish that he did not handle the gun or that he did not commit the ***

robbery."); see also *People v. Brown*, 2013 IL App (1st) 091009, ¶ 54 ("DNA evidence that does not match a defendant's DNA does not exonerate the defendant.").

¶ 39    While the presence of a defendant's DNA at a crime scene is often conclusively inculpatory, the opposite is not true—the lack of a DNA match to the defendant is not conclusively exculpatory. See *People v. Henderson*, 343 Ill. App. 3d 1108, 1121 (2003). The recovered DNA might not match Blanchard's DNA because he did not handle that credit card, or it might not match because he did not leave trace DNA on the credit card when handling it.

¶ 40    We understand Blanchard's larger point to be that, if he did not handle the credit card, it follows that the credit card was planted by the police, or if nothing else that the police lied about finding the credit card in his pocket. But the fact remains that the (likely) absence of his DNA on the credit card does not mean he did not have that credit card on him when the police caught him. So his overall point rests on a conclusion that we could not confidently make.

¶ 41    That, coupled with a reliable identification from the victim that is entirely independent of the contraband found on Blanchard, leaves us with no conclusive evidence of actual innocence. We do not find this new evidence so significant that it "places the trial evidence in a different light" or undermines our confidence in the guilty verdict. *Robinson*, 2020 IL 123849, ¶ 48.

¶ 42                                    II. Unreasonable Assistance

¶ 43    Blanchard also claims his postconviction counsel performed unreasonably by failing to amend his *pro se* petition to adequately present a claim of actual innocence.

¶ 44    There is no constitutional right to the assistance of counsel in postconviction proceedings. *People v. Addison*, 2023 IL 127119, ¶ 19. Rather, the right to counsel is a matter of legislative grace, and petitioners are entitled only to the level of assistance the Act grants, which our supreme court has called a "reasonable level of assistance." *Id.*

¶ 45    To ensure a reasonable level of assistance, Supreme Court Rule 651(c) requires that counsel (1) meet with the petitioner to ascertain his claims of constitutional deprivation; (2) examine at least the parts of the record relevant to the petition's claims; and (3) make any amendment to the petition necessary to an adequate presentation of petitioner's claims. *Id.*

¶ 46    At a minimum, the record as a whole must demonstrate "substantial compliance with the rule." *People v. Davis*, 156 Ill. 2d 149, 165 (1993). Counsel is not required to advance frivolous claims. *People v. Huff*, 2024 IL 128492, ¶ 22. Nor is counsel required to add new claims to the original petition. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006); *Davis*, 156 Ill. 2d at 164.

¶ 47    Counsel typically certifies compliance by filing a Rule 651(c) certificate swearing that she performed these obligations. A valid Rule 651(c) certificate, like the one here, creates a presumption of reasonable assistance unless the record affirmatively shows otherwise. *Addison*, 2023 IL 127119, ¶ 21. Our review of a claim of unreasonable assistance is *de novo*. *Id.* ¶ 17.

¶ 48    Blanchard claims postconviction counsel "generally did not understand the nature of Blanchard's claims" and that "the record in this case is confused on nearly every issue, including the nature of the proceedings themselves." He lists a litany of counsel's purported misapprehensions of what Blanchard filed or what he was trying to argue.

¶ 49    True, this case is not a paradigm of how the Act should play out—but that is Blanchard's fault. Even after he was appointed counsel, Blanchard kept filing *pro se* motions that were, on their face, conclusory, contradictory, or borderline frivolous. His actions forced the parties and court to consistently interpret whatever he had most recently filed. Counsel did what she was supposed to do—she "shaped his complaints into the proper legal form" so that his claim of actual innocence could be heard by the court. *Id.* ¶ 19.

¶ 50    Take the initial filing that became the kernel of his successive postconviction petition:

Blanchard titled it "Relief of Judgment Petition Purusant [*sic*] to 735 ILCS 5/13-214.3(c)" but noted, in the opening paragraph, that he was relying on section 2-1401 of the civil procedure code for relief. Blanchard then filed another motion, "Petitioner's Motion for Compliance with Ethics Rule 3.8," which accused the Cook County State's Attorney's Office of misconduct. In that motion, he attached Reich's report on the DNA testing and requested an evidentiary hearing on it and, in so many words, professed his innocence.

¶ 51    The court appointed counsel to review Blanchard's numerous filings and figure out what to do with them. Even then, Blanchard continued to pepper the court with *pro se* motions and notices—something he did repeatedly in his last postconviction proceedings, too. See *Blanchard*, 2023 IL App (1st) 191311-U, ¶¶ 17, 29, 32 (detailing Blanchard's "numerous filings" in case.) Postconviction counsel, with Blanchard's blessing, asked to reclassify everything as a postconviction petition. See *People v. Shellstrom*, 216 Ill. 2d 45, 52-53 (2005) (when *pro se* pleading alleges deprivation of rights cognizable in postconviction proceeding, court may treat pleading as postconviction petition "even where the pleading is labeled differently.")

¶ 52    Counsel should not be criticized for what she did; she should get a medal. She took a series of illogical or frivolous motions and repackaged "the defendant's claims into a proper legal form and [presented] them to the court." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18. She did not need to re-draft every one of her client's *pro se* filings when the nuts and bolts of the actual-innocence claim was readily apparent on their face.

¶ 53    Blanchard argues that the supplemental petition that counsel ultimately filed was "meritless" and "deficient," and that this too rebuts any presumption of reasonable assistance. Recall that counsel filed a supplemental petition the morning the parties argued the State's motion to dismiss. Counsel added two new claims: (1) that police violated their *Brady* duty to

turn over exculpatory evidence when they provided an incomplete response to Blanchard's FOIA request; and (2) that he was subjected to a "highly suggestive" show-up immediately after he was arrested that violated his due process rights. He says counsel failed to support either claim with a factual or legal basis, and this failure is tantamount to unreasonable performance.

¶ 54    We disagree. True, these claims did not go anywhere, but "postconviction counsel did not perform unreasonably in this case simply because [her] arguments were without merit or because [she] was unable to make the petition's allegations factually sufficient" for the court to grant relief. *People v. Williams*, 2025 IL 129718, ¶ 46.

¶ 55    The language of the supplemental petition makes clear that counsel took what Blanchard gave her—little more than barebones allegations—and shaped them into a form so the court could consider them. Counsel herself informed the court that she "did investigate" Blanchard's other claims but that she wasn't "able to find anything to support" them.

¶ 56    Given that comment and the valid Rule 651(c) certificate, we can safely presume that counsel "made a concerted effort to obtain evidence in support of [Blanchard's] post-conviction claims but was unsuccessful." *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 27. Nothing in the record "suggests that there are other facts or arguments counsel could have added to the postconviction petition." *Williams*, 2025 IL 129718, ¶ 48. Blanchard is unable to rebut the presumption that counsel performed reasonably.

¶ 57                              CONCLUSION

¶ 58    The judgment of the circuit court is affirmed.

¶ 59    Affirmed.